Whereupon the Court gave the following opinion : That without a conviction in a Court of Record of Irish Nell’s having intermarried with a slave, she could not become a slave, nor could her issue become slaves by virtue of such intermarriage, *216 That no presumption of such conviction arises from the petitioner and her ancestors having been always held ifi slavery. That the Court being satisfied that the records of St. Mary’s county have been lost since the period at which such conviction is supposed to have taken place, it is not necessary to show the record of the said conviction, but that hearsay evidence, being the best that can reasonably be expected in this case, may be admitted to prove that such conviction did take place. That no length of possession of the said Irish Nell and her descendants from the said marriage as slaves, nor any of the facts related- in any of the depositions taken in the said former -cause, are sufficient to satisfy the Court of such conviction.
(Hanson, J. and Goldsborough, J.)
*216 To this opinion the defendant’s counsel excepted.
By the second exception it appears, that the defendant by his counsel, produced and read in evidence to the Court, the record, proceedings and judgment, in the Court of Appeals, on a petition filed by William, and Mary Butler, the father and mother of the present petitioner, against Richard Boarman, by which said record it appears, that the Provincial Court gave judgment, at September term, 1770, for freedom to the petitioners, which judgment of the Provincial Court was reversed by the Court of Appeals at May term, 1771. And the defendant prayed the opinion of the Court, that the said judgment rendered in the Court of Appeals, was a good and sufficient bar against the present petitioner, and ■ sufficient to preclude her from any relief on her present ''petition. ■
But the Court were of opinion, that the said record, proceedings and judgment, were no bar to prevent the petitioner from claiming and having her freedom.
(Hanson, J. and Goldsborough, J.)
To which opinion the defendant excepted, and appealed to the Court of Appeals.
*217 Lv the Court ot? Appears.
/fenings, for the appellant. The petitioner is a mulatto, and descended from a free white Irish woman, called Irish Nell, who came into the province with Lord Baltimore, and intermarried with a negro slave during the existence of the act of 1663. After this act was repealed, Nell had children in consequence of this marriage, who were the ancestors of the petitioner. And the question is, whether she is entitled to freedom ? This question was heretofore determined on a petition of some of the same family of mulattoes, against one Boarman, of Charles county. The Provincial Court adjudged they were entitled to freedom ; but on appeal, this judgment was reversed.
The act of 1663, c. 6. reciting and condemning the practice of white women intermarrying with negroes, by which means also divers suits might arise, touching the issue, &c. enacts, “ that whatsoever free-born subject woman, should intermarry with any slave from and after the last day of that assembly, should serve the master of such slave during the life of her husband, and that all the issue of such free-born woman so married, should he slaves as their fathers were.”
The act of 1681, c. 4. reciting the ill use that had been sometimes made of the former act, by masters, &c. of white women procuring such marriages, and that inconveniences might arise by controversies touching the issue of such free-born women, enacts, “ that if any master, fkc. of any free-born English or white woman, should by any instigation, procurement, &c. suffer any such free-born English or white woman to marry a slave after the last day of that session of assembly, he should forfeit his title to the service of such woman, and the said woman should be free, &c. A penalty of *218 10,000 pounds of tobacco is laid upon the master for procuring or suffering such marriage, and the like penalty upon the priest who should marry them,”' &c. Then follows the repealing clause: “ And be if. enacted, &c. that an act, entitled, an act concerning negroes and slaves, be and is hereby utterly repealed, and made void; provided, that all matters and things relating in the said act to the marriage of negroes and free-born women and their issue, are firm and valid, according to the true intent and purpose of the said act, until the present time of the repeal thereof, any thing |n this act to the contrary notwithstanding.”
Two points arise. 1st. Jf the Court ought not to he hound by the former judgment. 2d. If the repealing act affects cyiy issue born of marriages contracted during the existence of the law of 1663, or if it ought to be construed to affect the marriages of white women with negroes, and the issue of such marriages only which happened after the repealing law.
As to the first it ought to be considered as a bar, being solemnly determined by a Court of the dernier resort. And if it is not a bar, it is tantamount to saying, that po judgment on a petition for freedom shall determine the property, but that every individual may petition as often as he pleases, notwithstanding the condition of his ancestors has been legally determined, and this without any new evidence. This would occasion such perplexity and expense to masters, that they had better emancipate their slaves at once, if they claim freedom, than be involved in endless litigation and perplexity.
It is a principle of justice, that the effect of decisions should be mutual. If the ancestor is adjudged free, it would liberate the issue, and if the master kept them in slavery, he would be subject to an action, and the judgment would be conclusive against him, unless he could show circumstances to distinguish the case, and the *219 irius pr obi nidi would be on him, ex censequenti it should have similar effects in his favour. The very point in issue has been tried before, where the ancestor was á ■slave;
Every judgment of a Court is conclusive, until reversed by appeal, or writ of error. But if the judgment appears iii force on the record, and the effect of it is to be impeached or destroyed in a collateral suit, it would he better to have no judgments, for they will only serve to mislead. Suppose the case of a replevin for negroes, would not a judgment respecting the slavery of the parent bind the issue ?
If a judgment is to be impeached cir destroyed, great public inconvenience, as well as private injury, will enure from such doctrine. The former adjudication Settled the law respecting the act tíf Í663. No person would hesitate, after it, to purchase such issue as slaves. No parent would think he made a precarious provision in devising the issue of such as had been adjudged slaves, and no doubt many purchases, bequests and distributions, of them have been made, as well as executions on them to satisfy creditors, all which may be bet afloat, if such petitions are retained.
The judgment of a Court now would be no more conclusive than a former one, and on any change of the Judges, either the petitioners or their masters might incline to bring on the matter again, in expectation of a change of opinion in their favour. Could the former petitioners, against whom the judgment was had, petition again ? If they could not, then they might be slaves under the same law that frees their issue. 4 Vin. 18. pl. 19. 2 Show. 213.
The petitioner should, at all events, show something happening since the former judgment to vary his case, or some fraud (which should be mentioned in the petition) practised in obtaining the former judgment, in *220 chancery a decree is conclusive, but may be opened on a discovery of fraud. If a petition for freedom is likened to a bill in chancery, an allegation and proof of such fraud should be made. If a new petition may be by the issue, in order to controvert a fact, yet certainly it ought not to be admitted to controvert a legal construction of an act of assembly, which has settled the law. This Would be making all legal decisions uncertain. The former decision has now become a rule of property, which it is dangerous to set aside. This is not like a rule of practice, which may be altered, and is only a future regulation that does not affect former transactions. 1 Bl. Rep. 264. 696.
It was a great field of argument some years ago, whether the increase of female slaves should go to a devisee for life of such slaves, or to the person to whom they were limited over. It was determined in the Court of Appeals, that they should be the property of the devisee for life, otherwise the devise might be of more expense than benefit to him, by his maintaining the issue until they were capable of labour, and on his decease, they would be lost to his family. Numbers of slaves have been held under this decision, which is considered as a rule of property, and no Court should destroy it by a'contrary determination. ‘ Those who argued contrary to that decision, insisted, that under the rule of the civil law, partus sequitur ventrem, and that where the female parent went, the issue should follow her. But the Court thought this rule only applicable to the condition of the issue, and not to their station, that is, their property.
The judgment, that the parent is a slave, must be a bar to the issue, unless :'uey claim freedom by a different or prior title. There the determination that the parent is a slave, shall uot affect'the issue, as where the iusue proves an act of manumission, though the parent *221 was a slave. This is claiming freedom under a different, title. Again, if by committing a particular offence, a person was to be a slave for life, there the issue, by showing how the slavery of the ancestor commenced, and their prior birth, would show a prior title to freedom.
2d point. That it was the received construction of the repealing act, at the time it passed, that it did not affect the issue of marriages, contracted during the law of 1663, may be collected from their having been always held in slavery. And usage is a good exposition of a statute. Doug. 232. 2 Rep. 81. If the masters were actuated entirely by interest, yet there were persons who would probably have interfered, and such a gross violation of -the law would hardly have passed unnoticed.
By the act of 1663, a property is undoubtedly vested in the masters of white women marrying slaves, and in the issue of such marriages and their descendants. And this was a property he had a right to dispose of, and the purchaser would have the same right. It would have been unjust in the legislature to have made an ex post facto law, which might have affected innocent purchasers. It was confirmed among the perpetual laws. 1676, c. 2. 2 Ld. Raym. 1352. 2 Show. 16.
The objection is, that the words in the repealing law, until this present time of the repeal, £s?c. prevents the law of 1663 from having any future efficacy, and, consequently, that it had no force whatever from that time. This construction is making the words altogether nugatory. For example, the marriages under the former law, were already continued until that time ; the master had already had the benefit of the service of the mother and the issue until that time. This is saying nothing at all, nor paying any regard to the other expressions, that “ all matters and things relating to the marriage of free-born women and their issue, are firm and valid, according to the true- intent and purpose of the said act, any- thing in *222 this act to the contrary notwithstanding.” What, in the act of 1663, related to the marriage of free-born women and their issue i The answer is plain, that Such women should serve during life, and all their issue should be slaves ; then all these ihings are to be firm and valid. But how are they so, if the repealing act entirely alters the effects; for a thing can never be said to remain in the same position, when its position is changed.
By construing, theref ne, the words “until this present time of the repeal .hereof,” in the sense they contend for, the other expi essions have no effect. But the words until the present time, £i?c. may be construed to have a consistent effect with the whole, to wit, that all such marriages, after the law of 1663, until this present time, and the issue of such marriages, shall be regulated by that law, but that such marriages, and the issue of such marriages, from that present time, (the time in the repealing act,) should n t be affected by the law of 1663. This, construction gives force to all the expressions, preserves former rights, and guards against future abuses. 1 Show. 108. And that the legislature had this effect in contemplation, is evident from the proviso, which is plainly thrown in to pre vent any construction, that the effects of marriages, under the law of 1663, were to be destroyed. They make use of the words, shall be utterly repealed and made void. \'s'c. It appears they were apprehensive these words right be thought to affect interests acquired under the former law, and therefore threw in the proviso to prevent such construction ; and,the general words in the provi so, had they not been qualified, would leave the act of 1663 as it was.
If the legislature intended to destroy all consequences under the act of 1663, they would have used the words that “ no matters or things, i\c, should be valid from thenceforth,” instead of expressions which are directly contrary. It was not unco» unon with the legislature, in re *223 pealing acts, to insert clauses saving of rights under former laws. But it never yet was contended, that such a saving destroyed or abridged those rights, when it is evident, from the insertion of such a clause, the intent was to preserve them. See the act of 1704, c. 67.
If the words “ until this present time of the repeal ¿hereof,” had not been inserted, the two clauses-would have been contradictory, for the law of 1681 would repeal that of 1663, and yet continue it as to all its eífeets ; therefore, until this present time was thrown in to prevent such effect.
To get over the objections that the repealing law did nothing, if it only confirmed things before until that time, it was said that the issue born before should continue slaves, but those born after the repeal should be free. What reason could the legislature have for such a dis tinction ? The making of the issue slaves was intended to deter women from such unnatural marriages, by the punishment of their issue. This punishment was intended to be continued or removed by the repealing law, as to marriages during the act of 1663. If to be continued, why should the issue born at one time, be more severely punished than those born at another ? Pari ratione, if intended to be removed, why should it he from one and not the other.
The legislature meant to preserve all effects of marriages under the act of 1663, or they did not; if they did, there was no reason for a discrimination of punishment, with respect to the. issue; if they did not, there was no reason for a discrimination of favour. Whatever may be our ideas now, at that time it would hardly have been thought politic, or productive of public convenience, to have made this distinction. To have part of the children of the same parents slaves and part free, might have occasioned scenes of villany, where those whose oaths were admissible, might have been witnesses *224 fortlie others, and iniquitous scenes of collusion carried on aniongst them. Sue It a distinction too, would have been a punishment on the owner of the mother, who must either maintain such after-born children, or suffer them to perish. This effect the legislature must have foreseen, and would doubtless have guarded against it, if theii intention was as contended for.
Again, this distinction of the prior and after-born issue destroys the principle, A at the act of 1663 was to have no effect after the repealing law, and admits, that the words until this present time are not to be tied up strictly to that period, but are to receive a future construction. If the legislature had in view the meaning contended for, how easy was it to have added the words now born, after the words “ free-born women and their issue,” instead of the comprehensive word all. In short, there is not one syllable in the law io justify this supposed construc-i tion.
The repealing law does not consider the act of 1663 so unjust or impolitic, but they repeal it only on account of the abuses that had been committed under it; they could, therefore, have jjo intention to destroy any of the rights of persons that were founded on a law, which law in itself they appear to have considered as a proper one. Suppose a law was passed that all conveyances to a man and his heirs should e in writing; that twenty years after, a law was made, reciting that many persons had been inveigled to make such conveyances, and that no conveyance to a man and his heirs should be effectual, unless acknowledged and recorded, and then suppose' a clause similar to the present, for repealing and making void the former act, with a proviso also, similar to the one in question, would it be right'to say that the estate of the party, though acquired under the former law, should immediately cease after the repealing act, and that It only meant to render valid what had passed before! *225 The estate had been possessed until that tirrie, therefore it was saying nothing at all. To get over this, suppose it should be said, that the heirs born before the repealing act, should enjoy it during their lives, but not their heirs after them. Would not this he giving up all reliance on the words “ until this present time of the repeal,” &c. be a manifest contradiction to the other words in the proviso, and a flagrant act of injustice.to those who derived rights under the former ? The cases are similar, except, that one respects real, and the other personal property.
Suppose, after the act of 1715, c. 44. making all negroes and other slaves, then imported, or thereafter to he imported, and their children then born, and thereafter to be born, slaves, a law had been passed, reciting that negroes were trepanned from their country, and then repealing the law of 1715, c. 44. and adding the same proviso as is added in the act in question.
Suppose a law made, giving the property of horses that run wild in the woods, to the person taking them. Suppose, afterwards, a repealing law made, which recited, that whereas many people had turned out and drove into the woods their neighbours’ cattle, which, after running some time wild they had taken up, and to avoid these mischiefs repealing the first law, with the same proviso, and in the same words as the present oiie, would not the takers up of cattle hold the stock coming from what they had properly taken up, under thé law ?
It is objected, that the repealing of an act does not destroy mesne rights, derived under the original act¿ therefore a bare repeal was sufficient, if rights so derived were intended to be continued. Therefore, by using the words “ until this present time of the repeal thereof,” the legislature meant to prevent the continuance of such mesne rights, after the repeal, and aiso to prevent persons from being molested for having exercised such rights under the original law, and this will give force to *226 the words “ until this present time,” &c. otherwise they would be nugatory.
In answer to this, it is asked, why insert in the act the words “ that all matters and things relating, in the said act, to the marriage of negroes and free-born women, and their issue, are firm and valid, according to the true intent and purposes of the said act.” If all the issue born before the repealing law, are to be free, the master is punished for bringing them up till they are serviceable, by then losing; them.
It is objected, that there ought to have been a conviction of the mother.
In the General Court, the opinions were divided. The two associates were of opinion that the former decision was no bar, also that a conviction ought to be proved, but that parol testimony by tradition of there having been such a conviction, was sufficient presumption, under the circumstances of the case, as accidents might have happened to the records. The Chief Judge was of opinion, that the former determination was a bar in this case. Also that no conviction was necessary to make the issue slaves. Further, that if a conviction was necessary, the length of time that the petitioner and the ancestor were kept in slavery, was a sufficient presumption of there having been a conviction.
Two points arise ; 1st. Whether a conviction is necessary ; 2d. If necessary, whether from the circumstances of the country, the burning of the court-house, and the great length of possession, was not presumptive evidence that a conviction had taken place.
The words in the act of 1663, c. 6. after saying the woman should serve the master of such slave, are “ and that all the issue of such free-born woman, so married, should be slaves as their fathers were.”
The law of England., applicable in any manner to this question, is, that of villenage, and there is no instance of any conviction to make a villein. But if pne does an *227 act which renders him a villein, the lord might immediately seize him as any other property ; and if he was detained by others, the lord might sue them, and on proving the facts would recover.
If a villein taketh a free woman to wife, the issue shall be villeins. But there never was an instance, that the woman must be convicted of such marriage before the lord’s right attaches. As soon as the issue arcborn, they are slaves, and the lord may seize them any where except in the presence of the king. Co. Litt. 23. a. 137. b, Sullivan’s Lect. 258. The common law puts the issue exactly in the same situation as the issue in the act of 1663. There must have been numberless prosecutions, if the law had required them, but none are to be found in the Year-Books, from Edw. I. to Hen. VII.
The principle of the objection is this; that where a statute imposes a punishment, there must be a precedent conviction. But this objection does not apply to the cases of vesting specific property for doing what was not an antecedent crime; for a statute declaring that, if a person does an act which he had a right to do before, another shall have his land, the other may enter, and a conviction is not necessary to vest the property. 3 Co. 37. Radcliff’s case.
Papists are disabled to purchase, by statute, the next protestant heir may seize the lands on the forfeiture, without any conviction. The proof of the other being a papist, is sufficient to support the title. Yet this may be a forfeiture of his whole property, and the statute does not direct a conviction. 3 Bac. Abr. 797.
When there is a question of slavery, though it affects the person of an individual, yet it is a mere question of properly. If it were considered otherwise, there must be different rules of evidence between this and all other cases; but what code of laws gives us such other evidence ?
The objection is, that if a law makes the issue of per *228 sons of a particular description slaves, that the issue cannot be held in slavery without the conviction of the ancestor, to prove that she comes within the description of the law. If this objection was well founded, all negroes would be free.
The description of the ancestor in the act of 1663, is, a iwhite -woman marrying a. negro. They say she must have been convicted of the fact of marrying a negro. The act of 1715, c. 44. makes negroes imported, and their issue, slaves ; the description, therefore, of the ancestor in this act, is an imported negro, ergo, she ought to have been convicted of being so. This act also points out the mode of conviction in some cases. In the act of 1663, no conviction is mentioned, nor in that of 1715; there must, therefore, be the same construction in both. The assembly considered white women, who so debased themselves as to marry negroes, to be no better than negroes, and indeed they deserve less favour. Black people are as much entitled to natural liberty as white.
But suppose the conviction of the mother was necessary to make her serve during the life of the husband, it has nothing, to. do with the issue. The master’s title to the issue does not depend on her service, but on the fact of the marriage. And the issue on the trial must be. ■was she, or was she not, married ? not was she, or was she not, convicted. The act does not say on conviction of the mother, but on her marriage. Suppose the master did not want the woman, and should choose to waive her service ; yet he would be entitled to the issue, on account of the marriage. It would be a strange construction to say a man should not waive a penalty given for his benefit. This would prevent a man’s doing a humane act, as it would subject him to. injury for doing it. How is the master of the slave to. get her convicted ? She might conceal herself so that no process could be served on her; and suppose she has children notwithstanding. Suppose she should remove into a different state, shortly after the marriage, and be there delivered; would no? *229 the issue and the descendants be his property ? or, because he has waived the legal process, is he to lose his property in the issue? If the law was to say, if an American married a European, the issue should be slaves, would a conviction be necessary ?
The clauses in the act are distinct and independent. The first is for making the woman serve. The second, for declaring the issue slaves on account of the marriage. It says that all the issue of such free-born women so married, shall be slaves; therefore, as to the issue at least, the proof of the marriage is all that is required. If the issue must be convicted of being the descendants of such marriage, they must in like manner be convicted of being descendants of imported negroes. Suppose a conviction had been produced, it would have been objected, that it could not be given in evidence, as a verdict ought not to affect persons who are no parties to it. If they say a judgment on a petition could not be a bar, how1 could a conviction in a criminal case, since the rule is, that a verdict in a criminal case cannot be given in evidence on a civil proceeding. Suppose a man indicted for forging a conveyance, and convicted, and the party claiming under this forged deed should bring an ejectment on it, and insist that it was a valid one, the conviction could not be given in evidence to defeat his title. Suppose it was evidence in this case, yet they would say it was not conclusive, but the petitioners might give evidence to prove there was no marriage, notwithstanding the conviction. Therefore masters may give evidence of a marriage, though there was no conviction, or the rule would not be mutual.
If a conviction is necessary, there is sufficient presumptive evidence of it. Facts may be proved two ways, by positive or presumptive evidence. Few ancient transactions admit of positive evidence. The issue of this marriage have always been held in slavery, and the pre-. sumption is, that they would not have been so held, had *230 they not been legally held. Some of those who made the law in 1663 are probably alive, and the thing, if unjust, would have been exclaimed against by them and others. This proves that the law was never so construed, and contemporary exposition is strong; or if a conviction was necessary, it proves that there was a conviction. It would, perhaps, be impossible to prove a conviction under the circumstances of many records being lost, and the court-house being burnt. Sec Bacon’s Preface to Acts of Assembly.
Suppose a man had held land for great length of time, and no patent could be found on record, would it not be presumed the record of it was lost ? Long possession is looked on as the best evidence of right. Lord Coke says, length of possession without a deed, is better evidence than a deed without possession. A patent is necessary for the granting of land, yet though none be found, the presumption is, there was one if the land has been long held; Then if they say that a conviction was necessary in this case, from the length of possession, the presumption is, there was one. The Court admitted evidence might have been given of a tradition that there was a conviction. Would tradition without possession have done, and will not possession without tradition do ? This would be rejecting the strongest evidence, and admitting the weakest.
It is objected, that presumption may be admitted in other cases, yet not in that of negroes, who have not the same means of prosecuting their rights. But in answer to this, there is no instance of negroes being refused to petition. There are many of this family, and they have been held in slavery for many years, and have never thought of petitioning till lately, when they had liberty to do it. On this principle, most people must lose their slaves, for the only title they can show in general, is length of possession. But length of possessiojji *231 5s not positive, but only presumptive, evidence of a right. But it seems they must show positively the first ancestor was a slave. If so, every person holding mulattoes, must unavoidably lose them. The act says, negroes and their issue shall be slaves. Now a mulatto may come from a negro and a white woman, as well as from a white man and a black woman; and it might be argued, that in favour of liberty, the first ought to be presumed, unless there is positive proof to the contrary. The master, we will suppose, has no positive evidence to prove this, but proves, that for a great number of years the mulattocs and their ancestors have been held in slavery ; but this is only presumptive proof they originally came from a black woman, and if no presumption is to have effect in these cases, they must of course be set free.
The two Judges who gave the opinion against us, said, we might give parol traditional evidence, that there had been a conviction. But traditional evidence is not positive, but presumptive. If it was positive evidence, it might be given in all cases, but traditional evidence is only admitted in particular cases. Gilb. Evid. 152. The Court, therefore, in this case, admitted presumptive evidence. ■ The Judges, by saying that they would have regarded traditional evidence, though they paid no regard to constant possession for a century, would have admitted the weakest evidence, whilst they rejected the strongest; for presumption arising from possession, is much stronger than any reports, however handed down. Therefore it is, that possession is admitted as proof in all cases of property, but parol tradition is confined to very few. Cowp. 110, 111. When a fact does not admit of proof, the next evidence is the circumstances which generally attend the fact. Gilb. 160; They say a conviction was necessary; if it was, what are the circumstances which would necessarily' attend it' *232 Certainly, the possession of the issue as slaves. But tradition would not necessarily accompany such conviction, nor would it, in my opinion, have any weight, if admissible, as tradition might arise from surmise. Tradition, in itself, is the weakest of all evidence, and never admitted but in case of necessity. If it was generally received, it would be of a dangerous tendency, as a designing person might designedly raise a report, in order to have it propagated and handed down for a particular purpose. In ejectment, no evidence could be given of a tradition that the land belonged to one of the parties, or his ancestors; but the possession of that party and his ancestor would be evidence. This shows the weakness of the one kind of evidence, when opposed to the other.
Chase, for the appellee. The petitioner is the great-grandchild of Irish Hell, a white woman, and as such is „ entitled to freedom, unless a slave in virtue of the act of 1663-4, which enacts “ that whatsoever free-born woman shall intermarry with any slave, shall serve the master of such slave during the life of her husband, and that all • the issue of such free-born woman, so married, shall be slaves, as their fathers were.” The preamble recites, that free-born English women married negro slaves, and that the act is made for deterring such free-born women from such shameful matches. This act is highly penal on the free-born women, as it subjects them to serve during the lives of their husbands, and is most penal and cruel on their innocent children, in making them and all their posterity slaves. This act was repealed in 1681.
The law of nature does not prohibit a white person marrying with a black person, and only negroes and their descendants were slaves in Maryland. It is the act of assembly alone, which creates the oifence and annexes the penalty, which is unjust and cruel; unjust to the *233 mother, because she is guilty of no crime, and most unjust and cruel to the offspring, who are wholly innocent. The marriage of a white woman with a negro slave is the crime, but the act prescribes no mode by which she is to be convicted of the crime, though such penal consequences are to follow the fact.
The General Court have given their opinion, that without a conviction in a Court of Record, of Irish Nells having intermarried with a slave, she could not become a slave, nor would her issue become slaves by virtue of such intermarriage. That the records of St. Mary’s being lost, since the period at which such conviction is supposed to have taken place, it is not necessary to show the record, but hearsay evidence may be admitted, to prove that such conviction did take place. Ought this opinion and judgment to be affirmed, or not ?
As the act points out no mode of conviction, I contend ihat there must be a trial according to the common law, by presentment and judgment. The law makes the marriage a crime. The marriage is a fact, and every fact created a crime, must be proved before a Jury, unless some other mode is prescribed by positive law, and a conviction and judgment thereon. If a statute creates an offence, and appoints no trial, it must be tried by the rules of the common law.
Irish Nell was an English subject, and as such entitled to all the privileges of an English subject in an equal degree with any other English subject, however possessed with wealth, and exalted in station or rank. If she committed the crime of marrying a negro slave, she would by law be subject to no punishment before conviction, in some mode, and she was entitled to the common law mode of trial by Jury, as no other mode was prescribed by law. By magna charta, (2 Inst. 45.) nullus liber homo disseisietur de libertatibus, nisi per legem terree. *234 Libertatibus signifies the laws of the realm. Nisi per legem terras, without due process of law. 2 Inst. 50, 51. Sullivan’s Leet. 352. 372. Stat. 28 Edw. III. c. 3. 42 Edw. III. c. 3.
If a witness is objected to, because he has committed some offence, as felony or perjury, that incapacitates him, to be a witness, evidence is not admissible to prove the fact, but the record of the conviction must be produced,' and the judgment thereon. The conviction without the judgment is not sufficient. Cowp. 3. 12 Vin. 131 .pl. 6. 5 Com. 545. Buller, 292. A fortiori in- this case, when the party violating the law is to be a slave during the life of her husband, and her issue slaves- for ever. In the case of attainder for treason and corruption of blood, if the lord claims the land by escheat, he must produce the record of the attainder. In either of these instances, if a hundred witnesses of unquestionable credit could, be produced, they would not be received to,-prove the fact of felony, perjury or treason.. Upon the same principles parol evidence is not admissible, to prove'that Irish Nell married a negro slave during the existence of the act of 1663.
Hearsay or tradition is not sufficient to prove- any crime. The act of 1663 makes it an offence, or crime, highly penal, for a white woman to marry a negro slave. Suppose Irish Nett had been indicted for marrying a slave, would evidence be received of what the clergyman and others present at the wedding, but dead before the trial, had declared ? Certainly not.. Will length of time make that, admissible, which was not so in the beginning ? If such evidence was illegal to convict Irish Nett, it cannot now be received against her issue.
By the act of 1715, c. 44. s. 26, 27, 2-8. the mode of proceeding is pointed out in. the case of white persons having children b.y negroes or slaves. The-a.ct of 166~- *235 points out no mode of conviction. Is any, or what mode is necessary ? If a statute inflicts a penalty for doing a thing, which was no offence before, but does not appropriate the penalty, or direct any method of recovery, such offence is not indictable, but debt lies to recover the penalty. Poph. 175. 2 Stra. 828. If the offence was punishable at common law, an indictment lies. If u statute appoints a particular method of proceeding, as by information, &c. without mentioning indictment, no indictment lies. 4 Bac. 654. 2 Hawk. 211. Plowd. 206, 207.
The trial of all criminal matters is by the country, and the party accused cannot be denied it unless it be his own fault. As if he will not plead. Trials per pais, 16. or 14. cites Staundf. P. C. 150. 4 Shep. Abr. 154. If .a statute gives justices a power, generally to determine a matter at the sessions, it must be according to law, and as a Court. 6 Mod. 17. 1 Vent. 33. 37. 171. If, whenever an act of parliament makes an offence, and is silent on the manner of trying it, it shall be intended to be a trial per pais, according to magna charts. 7 Mod. 99. Hob. 127. And if the law speaks of proof, it is intended to be by Jury. 5 Co. 108. Vin. Trial, 71. pl. 19. 75. pl. 4. 1 Burr. 389. 545. 2 Burr. 803. 805. Cowp. 297. Judgment for corporal punishment, cannot be given against one in his absence. Salk. 400, When a statute wills any thing to be done generally, and does not appoint any special means, it shall be granted according to the course of the common law. Vin. Statute, 512. pl. 13. Savil. 39. If an act of parliament inflicteth no penalty, the offender is liable to be punished by fine and imprisonment, upon indictment. 2 Burn's Eccles. Law, 426. Where a trial by Jury is dispensed with, and a speeial power is given to a justice to convict an offender in a nummary way, yet he must proceed according to the course of the common law, in trials by Jury. 1 Burn's Just. 363. 4 Com. 150, The justice acts both as Jury *236 and Judge, and his conviction must contain both a verdict and a judgment. Doug. 638. Evidence must be stated. 2 Burr. 1167. 1184. 3 Burr. 1786. 4 Burr. 2063, 2064. In an indictment, it must appear on the record that the trial was had by twelve jurors, otherwise the judgment will be reversed. 2 Bl. Rep. 718.
.The Court of Appeals, at June term, 1791, affirmed the judgment of the General Court.